**No. 20-17389**

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

FELIX MENDELSON, as trustee for
THE SHTAIMAN FAMILY TRUST,

*Plaintiff-Appellant*,

v.

COUNTY OF SAN MATEO,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Northern District of California
No. 3:20-cv-05696-AGT
Hon. Alex G. Tse

---

## APPELLANT'S OPENING BRIEF

---

Paul J. Beard II
FISHERBROYLES LLP
4470 W. Sunset Blvd., Suite 93165
Los Angeles, CA 90027
Telephone No.: 818-216-3988
Email: paul.beard@fisherbroyles.com

*Attorney for Appellant*
FELIX MENDELSON, as trustee for
THE SHTAIMAN FAMILY TRUST

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ......................................................................1

II.    JURISDICTIONAL STATEMENT .................................................3

III.   STATEMENT OF ISSUES PRESENTED FOR REVIEW ...........................4

IV.   STATEMENT OF THE CASE .......................................................5

     A.    The California Coastal Act and Local Coastal Programs ....................5

     B.    The County's Certified LCP ..................................................8

     C.    The Coastal Act's "Savings" Clause That Shields the State from Takings Liability Arising Out of Application of the Act....................9

     D.    The LCP Prohibits Development in the County's Riparian Corridor and Buffer Zone, Where Mr. Mendelson's Lots and Paper Streets Providing Access to Said Lots Are Located .......................................11

     E.    Mr. Mendelson's 2019 Application to the County .............................13

     F.    Mr. Mendelson's Claims Against the County.....................................14

     G.    The District Court's Ruling Granting the County's Motion to Dismiss ...............................................................................15

V.    SUMMARY OF THE ARGUMENT ..............................................15

     A.    Mr. Mendelson's Takings and Seizure Claims Are Ripe...................15

     B.    Mr. Mendelson States Facts Sufficient to Support a Seizure Claim...17

     C.    Mr. Mendelson's Seizure Claim Is Ripe ............................................18

VI.   STANDARD OF REVIEW ..........................................................19

VII.  ARGUMENT ..........................................................................19

ii

A.  Mr. Mendelson's Takings Claim Is Ripe .............................................19

    1.  The Claim Is Ripe, Because It Is Certain That
No Development Can Be Approved on Mr. Mendelson's
Lots Under the LCP ...................................................................19

    2.  The Coastal Act Does Not Provide the County
Any Discretion To Ignore Its Own LCP ...................................22

    3.  Submitting a Development Proposal to the County
Would Be an Exercise in Futility, Which No Court
Precedent Demands....................................................................25

    4.  Requiring Mr. Mendelson To Submit a Development
Proposal That the County Must Deny Would Impose
an Undue Burden on Him ..........................................................27

    5.  Courts Have the Discretion To Assume Ripeness and
Proceed to the Merits of the Takings Claim .............................29

B.  Mr. Mendelson States Facts Sufficient to Support
His Seizure Claim....................................................................................30

C.  Mr. Mendelson's Seizure Claim Is Ripe .............................................33

VIII.  CONCLUSION............................................................................................34

CERTIFICATE OF COMPLIANCE........................................................................36

ADDENDUM ..........................................................................................................37

# TABLE OF AUTHORITIES

## Cases

*Abbott Labs. v. Gardner*,
387 U.S. 136 (1967)....................................................... 18, 30, 33-34

*Adams Bros. Farming, Inc. v. County of Santa Barbara*,
604 F.3d 1142 (9th Cir. 2010) ....................................................... 29-30

*Carson Harbor Vill., Ltd. v. City of Carson*,
353 F.3d 824 (9th Cir. 2004) ........................................................19

*City of Oakland v. Wells Fargo & Co.*,
972 F.3d 1112 (9th Cir. 2020) ........................................................19

*Golden v. Cal. Emergency Physicians Med. Group*,
782 F.3d 1083 (9th Cir. 2015) ........................................................30

*Hoehne v. County of San Benito*,
870 F.2d 529 (9th Cir. 1989) ........................................................26

*Knick v. Twp. of Scott*,
139 S. Ct. 2162 (2019)........................................................20

*Lucas v. South Carolina Coastal Council*,
505 U.S. 1003 (1992) ........................................................14

*Marbury v. Madison*,
5 U.S. 137 (1803)........................................................15

*MacDonald, Sommer & Frates v. Yolo County*,
477 U.S. 340 (1986)....................................................... 19, 29

*McAllister v. Cal. Coastal Comm.*,
169 Cal. App. 4th 912 (2008) ........................................................11

*Pakdel v. City & Cty. of San Francisco*,
952 F.3d 1157 (9th Cir. 2020) ........................................................29

*Palazzolo v. Rhode Island*,
533 U.S. 606 (2001)....................................................... 16, 20-21, 25, 27, 29

*Pepper v. Village of Oak Park*,
430 F.3d 805 (7th Cir. 2005) ........................................................33

*Presley v. City of Charlottesville*,
464 F.3d 480 (4th Cir. 2006) ....................................................... 30-33

*Rowe Educ. Credit Mgmt. Corp.*,
　559 F.3d 1028 (9th Cir. 2009) ...................................................9

*Security Nat'l Guaranty, Inc. v. Cal. Coastal Comm.*,
　159 Cal. App. 4th 402 (2008) ............................................ 9, 23

*Severance v. Patterson*,
　566 F.3d 490 (5th Cir. 2009) ..................................................18

*Skinner v. Ry. Labor Executives' Ass'n*,
　489 U.S. 602 (1989)..................................................................31

*Soldal v. Cook Cty.*,
　506 U.S. 56 (1992)........................................................... 18, 31-32

*Suitum v. Tahoe Reg'l Planning Agency*,
　520 U.S. 725 (1997)........................................... 16, 20, 28-29

*United States v. Gray*,
　484 F.2d 352 (6th Cir. 1973) ..................................................33

*Vigil v. Tansy*,
　917 F.2d 1277 (10th Cir. 1990) ..............................................25

*Williamson County Reg'l Planning Com. v. Hamilton Bank*,
　473 U.S. 172 (1985)..................................................................20

*Yost v. Thomas*,
　36 Cal. 3d 561 (1984) ................................................................6

## Constitutional Provisions

U.S. Const., amend. IV .......................................... 2, 14, 18, 30

U.S. Const., amend. V.................................................... 2, 14

U.S. Const., amend. XIV ........................................ 2, 18, 30

## Statutes

28 U.S.C. § 1291 ............................................................................4

28 U.S.C. § 1331 ............................................................................3

28 U.S.C. § 1343 ............................................................................3

28 U.S.C. § 2201 .................................................................................... 3-4

42 U.S.C. § 1983 ............................................................................... 3, 14

Cal. Pub. Res. Code § 30001 .................................................................5

Cal. Pub. Res. Code § 30001.5 ..............................................................5

Cal. Pub. Res. Code § 30004(a) .............................................................6

Cal. Pub. Res. Code § 30005(a) .............................................................6

Cal. Pub. Res. Code § 30007.5 ..............................................................5

Cal. Pub. Res. Code § 30010 ...................................... 10-11, 17, 22, 24

Cal. Pub. Res. Code § 30108.6 ..............................................................6

Cal. Pub. Res. Code § 30200 ............................................................. 5-6

Cal. Pub. Res. Code § 30240 ..................................................................5

Cal. Pub. Res. Code § 30512.2(a) .........................................................11

Cal. Pub. Res. Code § 30514 ................................................................24

Cal. Pub. Res. Code § 30519 ..................................................................9

Cal. Pub. Res. Code § 30600(b)........................................................ 8-9

Cal. Pub. Res. Code § 30600.5 ...............................................................9

Cal. Pub. Res. Code § 30603(a).........................................................7, 9

Cal. Pub. Res. Code § 30604(a) ...................................................... 8, 22

Cal. Pub. Res. Code § 30604(b)........................................................ 7-8

Cal. Pub. Res. Code § 30620(a)(3) ........................................................8

Cal. Pub. Res. Code § 30330 ..................................................................5

Cal. Pub. Res. Code § 30500 ..................................................................6

Cal. Pub. Res. Code § 30500(a) .............................................................6

Cal. Pub. Res. Code § 30500(c) .............................................................6

Cal. Pub. Res. Code § 30512.2(a) .........................................................6

vi

Cal. Pub. Res. Code § 30513 ....................................................................6

Cal. Pub. Res. Code § 30519 ............................................................ 7, 23

Cal. Pub. Res. Code § 30600.5 ...............................................................23

San Mateo County Zoning Regulations, § 6328.3............................... 8, 23

San Mateo County Zoning Regulations, § 6328.12.............................. 8, 23

San Mateo County Zoning Regulations, § 6328.13....................................8

# I.  INTRODUCTION

Appellant Felix Mendelson seeks basic fairness from Appellee San Mateo County—in the form of compensation—for vacant, residential lots that the County has designated by law as sensitive habitat and thus totally undevelopable. To avoid his claims to compensation, the County argues they are unripe, because he hasn't first submitted a costly and time-consuming proposal for development—a proposal that the County disingenuously suggests it has the discretion to review and approve, irrespective of the plain meaning of its own law. It has no such discretion, and the claims are therefore ripe. This appeal from a dismissal of the claims on ripeness grounds turns on pure questions of law and cries out for reversal.

Mr. Mendelson owns four vacant lots in a residentially zoned area of the County. While ready, willing, and able to build a home on each of his lots, Mr. Mendelson is categorically prohibited from doing so. His lots lie entirely within the "Montecito Riparian Corridor" and its "buffer zone," while the undeveloped paper streets that provide the only access to those lots run right through the heart of the Riparian Corridor. That makes the lots and paper streets completely undevelopable under the County's land-use regulations, as embodied in its "Local Coastal Program" (LCP). As a consequence, the County *must* deny any proposal to develop the lots and paper streets for any economically productive use, including to construct single-family homes (for which the lots are otherwise zoned).

In August 2020, Mr. Mendelson filed this civil rights action against the County under 42 U.S.C. § 1983. He alleges a taking of his lots under the Fifth

Amendment to the United States Constitution or, in the alternative, a seizure of the same under the Fourth Amendment. U.S. Const. amends. IV, V, XIV (incorporating Fourth and Fifth Amendment protections as against local governments). Having been deprived of all access to, and economically beneficial use of, his property, Mr. Mendelson is entitled to compensation from the County for his loss.

The County moved to dismiss Mr. Mendelson's civil rights action on ripeness grounds, arguing that Mr. Mendelson must first submit and be denied at least one development proposal, regardless of the fact that the LCP prohibits all economically viable development of his land and paper streets that are the only legal access to it. The County argues it has the discretion to apply a "savings" clause in an inapplicable law—the California Coastal Act—to circumvent its own LCP in order to avoid a taking or seizure. The County also argues that Mr. Mendelson does not state sufficient facts to support a seizure claim.

The district court granted the County's motion to dismiss both claims. First, the court held that Mr. Mendelson's claims were unripe, because he failed to first give the County the opportunity review and deny a development proposal for the lots. But the court simply assumed, with no attempt at an interpretation of the applicable land-use regulations, that the County has the discretion to authorize development in the first place. It decidedly does not. As stated above, the County's LCP bars development of Mr. Mendelson's lots and paper streets—absolutely and without exception. The LCP confers no discretion on the County to circumvent or suspend that prohibition. Mr. Mendelson's takings claim is ripe for review.

2

So, too, is his seizure claim. That claim is reviewed for ripeness under a different framework than the takings claim, requiring courts to weigh a variety of factors as to whether judicial review is appropriate. Most relevantly, because the seizure claim raises a purely legal question based on a plain reading of the LCP, and has a direct and immediate impact on Mr. Mendelson's ability to physically access his lots, the claim should be deemed ripe.

Because it disposed of the seizure claim on ripeness grounds, the district court did not rule on the County's alternative argument that the complaint failed to state a seizure claim. On that question, the County errs. An unreasonable seizure occurs when the government unlawfully interferes with a landowner's meaningful possession of his property. There can be no question that the LCP deprives Mr. Mendelson of all physical access to and use of his lots, which lie entirely within the vegetated Riparian Corridor and buffer zone. As such, he cannot meaningfully possess his property. Given the totality and unconditional nature of that deprivation, the facts as alleged in the complaint easily support a claim for unreasonable seizure.

For these reasons, the Court should reverse the district court's order dismissing Mr. Mendelson's claims, with instructions to deny the County's motion in its entirety.

## II.   JURISDICTIONAL STATEMENT

The district court had original jurisdiction over Mr. Mendelson's claims pursuant to 42 U.S.C. § 1983, 28 U.S.C. § 1331, 28 U.S.C. § 1343, and 28 U.S.C.

§ 2201.

This Court has jurisdiction pursuant to 28 U.S.C. § 1291, because the district court rendered a final order granting a motion to dismiss all claims. Excerpts of Record ("ER") 1, 6. The order was entered on December 1, 2020. ER-3. Mr. Mendelson filed his notice of appeal on December 8, 2020. ER-9. The appeal is timely under Rule 4(a)(1)(A) of the Federal Rules of Appellate Procedure.

## III.    STATEMENT OF ISSUES PRESENTED FOR REVIEW

Issue No. 1: Did the district court err in ruling that the Plaintiff's takings claim is unripe unless he submits a development proposal for his property, where the Defendant permitting agency has no discretion to avoid the law's categorical prohibition on all economically beneficial development of the property, and any such development proposal would meet certain denial? ER-7.

Issue No. 2: Did the district court err in ruling that the Plaintiff's seizure claim is unripe, where the claim presents a pure question of law on undisputed facts, and the dispute directly and immediately impacts Plaintiff's ability to use and develop his property? ER-7.

Issue No. 3: Does Plaintiff state a claim for seizure of his property, where Defendant's own law categorically prohibits all use and development of the paper street providing the sole access to the property, thereby meaningfully interfering

4

with his possession of his property?[1]

An Addendum with pertinent constitutional and statutory provisions appears at the end of this brief.

## IV.    STATEMENT OF THE CASE

### A.    The California Coastal Act and Local Coastal Programs

The California Coastal Act was enacted to subject land development in the state's coastal zone to a baseline of standards and restrictions, with the goal of protecting coastal resources, such as "sensitive habitat areas." Cal. Pub. Res. Code §§ 30001, 30001.5, 30240. Those minimum standards are found in Chapter 3 of the Act, entitled, "Coastal Resources Planning and Management Policies." *Id.* § 30200 *et seq.* So "paramount" is the Act's objective of protecting sensitive habitats and other coastal resources that, when one or more of its policies conflict, "such conflicts [must] be resolved in a manner which on balance is the most protective of significant coastal resources." *Id.* § 30007.5.

The Act creates a state agency—the California Coastal Commission—tasked with "primary responsibility for [its] implementation," as described in greater detail below. *Id.* § 30330. But local governments lying in the coastal zone have an essential role to play in protecting sensitive habitats and other coastal resources

---

[1] Mr. Mendelson vigorously opposed the County's motion to dismiss the seizure claim, including on the ground that the complaint fails to state facts sufficient to support that claim. (Docket No. 15, pp. 18-19). The district court did not rule on this question, because it deemed the seizure claim unripe. ER-5.

within their jurisdiction. *Id.* § 30004(a). They do that by creating their own local land-use regulations that are tailored to "local conditions" and that, at a minimum, reflect the substantive standards and restrictions of Chapter 3 of the Act. *Id.* §§ 30004(a), 30005(a), 30500.

To that end, the Coastal Act requires that each such local government prepare a Local Coastal Program (LCP). *Id.* § 30500(a). An LCP consists of (1) a land use plan, (2) zoning ordinances and maps, and (3) other actions that implement the land use plan. *Id.* § 30108.6. Significantly, "[t]he precise content of each [LCP] shall be determined by the local government . . . in full consultation with the commission and with full public participation." *Id.* § 30500(c).

Before the local government can adopt and start applying an LCP, the Coastal Commission must certify that the LCP conforms, at a minimum, to "the policies of Chapter 3" of the Coastal Act. *Id.* § 30512.2(a); *see also id.* § 30513 (zoning ordinances and maps must adequately carry out the land use plan, which in turn must conform to Chapter 3). An LCP can be *more* restrictive of development, in favor of sensitive habitats and other coastal resources, than Chapter 3 policies; but it cannot be *less* restrictive. *Id.* § 30005(a).

It is important to note that the Act contains (10) chapters. But a local government's LCP must conform only to Chapter 3, which sets forth the minimum standards that every LCP must meet. *Id.* § 30200, *et seq.*; *see also Yost v. Thomas*, 36 Cal. 3d 561, 566, 573 (1984) (holding that the Coastal Act "merely requires local governments to comply with specific policies" of Chapter 3). A local

government need not conform to, let alone duplicate or incorporate, provisions *outside* Chapter 3 of the Coastal Act.

Once the local government adopts a certified LCP, it acquires the authority to issue Coastal Development Permits for projects within its jurisdiction. Cal. Pub. Res. Code § 30519(a). After certification, the local government applies the LCP, which becomes the exclusive standard for deciding whether—and the extent to which—a particular property may be developed. *Id.* § 30604(b). As section 30604(b) makes clear, "[a]fter certification of the local coastal program, a coastal development permit shall be issued if . . . the proposed development is in conformity with the certified local coastal program."[2]

In local jurisdictions without a certified LCP, the substantive policies of Chapter 3 of the Coastal Act govern and must be applied to proposed development. *Id.* § 30603(a).

---

[2] Even after a local government adopts an LCP, the Commission can, in delimited circumstances, review projects on appeal. Cal. Pub. Res. Code § 30603(a). But, with a rarely used exception not applicable here, only a local government's *approval* of a project is appealable to the Commission; a local government's *denial* of a project is not. An exception provides that "[a]ny development which constitutes a major public works project or a major energy facility"—whether approved or denied by the local government—is appealable to the Coastal Commission. *Id.* § 30603(a)(5). Apart from that exception, only project approvals are appealable. Further, appeals are limited to those approvals alleged to violate the LCP or "public access policies" of Chapter 3 of the Act. *Id.* § 30604(b).

**B.      The County's Certified LCP**

In late 1980, the San Mateo County Board of Supervisors approved an LCP for the County, which the Commission certified as consistent with Chapter 3 of the Coastal Act. ER-13 (Complaint ¶ 8). All development in the unincorporated coastal areas of the County, including construction of a single-family home, requires Coastal Development Permit approval from the County. *Id.*

In deciding whether to approve or deny a Coastal Development Permit, the County acts pursuant to and applies only its LCP.[3] Cal. Pub. Res. Code § 30604(b). Section 6328.12 of the County's Zoning Regulations (a part of the LCP) provides the "Standards for Application Review" when a project requiring a Coastal Development Permit comes before it. Section 6328.12 requires the County to review Coastal Development Permit applications "for compliance with . . . all applicable plans, policies, requirements and standards of the ***Local Coastal Program***."[4] San Mateo County Zoning Regulations ("Zoning Regulations") § 6328.12 (emphasis added)[5]; *see also id.* § 6328.3(e) (defining a "Coastal

---

[3] Absent a certified LCP or certified land use plan, the County would be required to act pursuant to and apply the provisions of ***the Coastal Act*** when reviewing Coastal Development Permit applications. Pub. Res. Code §§ 30604(a), 30600(b)(1), 30620(a)(3).

[4] The County must also ensure consistency with its General Plan, as well as the requirements of the underlying district and other provisions of the zoning regulations. Zoning Regulations § 6328.12. The LCP takes precedence over conflicting requirements of the underlying district or of the zoning regulations. *Id.* § 6328.13. But the County does not construe or otherwise apply the Coastal Act in reviewing Coastal Development Permit applications.

[5] Pertinent Zoning Regulations are reproduced in the Addendum.

8

Development Permit" as "a letter or certificate . . . approving a project . . . as being in conformance with the Local Coastal Program"); Cal. Pub. Res. Code § 30519 (providing that certification of an LCP ends the Commission's "development review authority," which is thereafter delegated "to the local government that is implementing the local coastal program"); *id.* § 30600.5 (following certification of a land use plan, the local government must issue a Coastal Development Permit if the project "is in conformity with the certified land use plan"); *cf. Security Nat'l Guaranty, Inc. v. California Coastal Comm.*, 159 Cal. App. 4th 402, 422 (2008) (holding that where there is a certified LCP, the question is whether "the development . . . conform[s] to the standards set forth in the certified LCP").

As the foregoing sections of the County's LCP establish, once the Coastal Commission certifies an LCP, the Coastal Act simply does not apply when the local government processes Coastal Development Permits.

## C. The Coastal Act's "Savings" Clause That Shields the State from Takings Liability Arising Out of Application of the Act

The substantive standards and policies of the Coastal Act continue to govern proposed development in those jurisdictions of the coastal zone that lack a certified LCP. Cal. Pub. Res. Code § 30603(a). In those jurisdictions without an LCP, either the Coastal Commission or the local government applies the Coastal Act to proposed development. *Id.* § 30600(b).

The Coastal Act's strict protection of sensitive habitats and other coastal resources can create the risk of destroying the beneficial use and value of private property, leading to takings requiring compensation. Foreseeing this risk of an

unfunded liability for takings, the Legislature included a "savings" clause in *Chapter 1* of the Act. Section 30010 requires permitting agencies applying the Act to allow the minimum development necessary to avoid an uncompensated taking, even though the Act as written might otherwise preclude all use. Cal. Pub. Res. Code § 30010. Again, section 30010 appears in Chapter 1 (not Chapter 3) of the Act and provides, in its entirety:

> The Legislature hereby finds and declares that *this division [i.e., the Coastal Act]* is not intended, and shall not be construed as authorizing the commission, port governing body, or local government *acting pursuant to this division* to exercise their power to grant or deny a permit in a manner which will take or damage private property for public use, without the payment of just compensation therefor. This section is not intended to increase or decrease the rights of any owner of property under the Constitution of the State of California or the United States.

*Id.* (emphasis added) (reproduced in Addendum).

As made plain in the text, section 30010 applies to permitting agencies (including the Coastal Commission[6]) that are required, in the absence of a certified LCP, to apply the *Coastal Act* to a development proposal. By its own terms, section 30010 does not apply to permitting agencies construing and applying other laws, such as certified LCPs.

---

[6] No state law authorizes the California Coastal Commission to exercise the power of eminent domain or pay compensation for property that it takes. That reality is reflected in section 30010, which confirms that the Commission may not commit an uncompensated taking of property through its permit decisions.

Nor can one presume that all LCPs implicitly incorporate section 30010. A certified LCP is presumed to conform only to "the minimum policies and standards of the Coastal Act"—i.e., the "development restrictions" contained in Chapter 3 of the Act. *McAllister v. California Coastal Com.*, 169 Cal. App. 4th 912, 931 (2008); Cal. Pub. Res. Code § 30512.2(a) (requiring conformance only with Chapter 3). Because the Act does not require conformance to provisions outside of Chapter 3, such as section 30010 in Chapter 1, there is no presumption that a certified LCP incorporates or otherwise adopts non-Chapter 3 provisions. Of course, a local government *may*, if it chooses, replicate provisions outside Chapter 3. But it is not *required* to do so. As explained in *McAllister*, for example, the County of Monterey had its own version of section 30010, which mandated that its LCP not be construed to authorize that county to apply its provisions in a way that would result in an uncompensated taking. *McAllister*, 169 Cal. App. 4th at 938-39.

The County has opted against replicating section 30010 in its LCP. The County's LCP does not contain any "savings" clause or any other mechanism allowing it to escape its clear obligation to deny a proposal on property where the LCP otherwise bars development.

## D. The LCP Prohibits Development in the County's Riparian Corridor and Buffer Zone, Where Mr. Mendelson's Lots and Paper Streets Providing Access to Said Lots Are Located

Mr. Mendelson owns four vacant lots in the El Granada area of San Mateo County, east of State Highway 1. ER-15 (Complaint ¶ 19). His lots are located in the R-1 zoning district, which normally would allow one single-family home per lot. ER-16 (Complaint ¶ 21). But the lots and the paper streets leading to them are

covered in legally protected riparian vegetation, and the LCP maps the lots and streets as being within the "Montecito Riparian Corridor." ER-16—17 (Complaint ¶¶ 20-23); ER-38 (Complaint, Exh. B). An aerial view of the paper streets' and lots' location inside the Riparian Corridor appears at paragraph 22 of the Complaint. ER-16.

Riparian corridors are a kind of "sensitive habitat area" that the LCP strictly protects. ER-23 (LCP Policy 7.1). The County's LCP prohibits the development and use of properties and paper streets lying in the Montecito Riparian Corridor, as well as in the corridor's buffer zone. ER-13—14 (Complaint ¶¶ 11-13); ER-24—26 (LCP Policies 7.8 - 7.12). There is no exception in the LCP from this prohibition. Specifically, the LCP does not provide the County with the discretion or flexibility to deviate from the LCP's development prohibition, through either a variance procedure or other mechanism. ER-14 (Complaint ¶ 14).

If Mr. Mendelson were to submit a Coastal Development Permit application for residential development of his four lots, the County would be required to review the application "for compliance with . . . all applicable plans, policies, requirements and standards of the Local Coastal Program." Zoning Regulations § 6328.12. The LCP would require denial of the Coastal Development Permit application, because Mr. Mendelson's lots, as well all paper streets leading to them, are within the Montecito Riparian Corridor, where all economically viable or productive use is flatly prohibited. ER-13—14 (Complaint ¶¶ 11-13); ER-24—26 (LCP Policies 7.8 - 7.12). Mr. Mendelson could avail himself of no variance from

or exception to this inevitable denial, because the LCP provides property owners with no such mechanism. ER-19 (Complaint ¶ 39).

In addition, before the County would even accept a Coastal Development Permit application for a residential project, Mr. Mendelson would first need to provide the County with a survey of the property proposed for development. ER-17 (Complaint ¶ 26). That would require hiring at least a biologist and surveyor. *Id.* For them to do their work, the impassable vegetation and habitat along the paper streets to the lots, as well as on the lots themselves, would need to be cleared. *Id.* That vegetation clearance would itself require a Coastal Development Permit from the County. *Id.* But, under the plain terms of the LCP, even that initial Coastal Development Permit—for that ***pre-application*** work—would have to result in denial as a matter of law, because it would require the destruction of protected riparian resources for residential development. ER-13—14 (Complaint ¶¶ 11-13); ER-24—26 (LCP Policies 7.8 - 7.12); ER 14 (map of lots' location in corridor). Mr. Mendelson estimates that many tens of thousands of dollars would therefore be wasted on a permit process whose outcome would be certain denial. ER-14 (Complaint ¶ 15).

### E.    Mr. Mendelson's 2019 Application to the County

Perhaps recognizing the costly and insurmountable barriers to development of property in the Riparian Corridor, the County has instituted a special application process. Under that process, an owner with land in a developmentally constrained area can apply to the County for a so-called "takings analysis" without submitting a specific development plan. ER-15 (Complaint ¶ 18). Upon application, the

County renders a determination as to whether and the extent to which the LCP would allow development on the owner's land—and, if development is prohibited, whether the prohibition effects a compensable taking. *Id.*

In 2019, Mr. Mendelson was ready, willing, and able to build single-family homes on his lots, but he soon came to the obvious conclusion that he could make no economic or productive use of his property based on a plain reading of the LCP. ER-18 (Complaint ¶ 31). Accordingly, he availed himself of the County's special application procedure and sought a formal determination from the County confirming that conclusion. ER-18 (Complaint ¶ 29). Despite Mr. Mendelson's repeated attempts to obtain confirmation over the course of the following six months, the County never responded, supplied a takings analysis, or otherwise suggested that his request was incomplete. ER-18 (Complaint ¶ 30).

### F.    Mr. Mendelson's Claims Against the County

In August, Mr. Mendelson filed a federal civil rights suit against the County under 42 U.S.C. § 1983, alleging two claims. First, he alleges that the LCP effects a categorical taking of his lots without compensation, in violation of the Takings Clause of the Fifth Amendment to the United States Constitution. ER-18—19; *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1018-19, 1025 n.12 (1992) (a taking occurs when the owner is deprived of all developmental or economically beneficial" or "viable" use of his property).

Second, and in the alternative, Mr. Mendelson claims that the County has unreasonably seized his lots, in violation of the Fourth Amendment to the United States Constitution. ER-19—20. He alleges that, by depriving him of all access to

and use of his properties, the County has totally—and unreasonably—seized the lots. He seeks compensation for violation of his constitutional rights.

## G.     The District Court's Ruling Granting the County's Motion to Dismiss

The district court granted the County's motion to dismiss both claims on ripeness grounds. ER-8. In a six-page opinion, the court concluded that the takings and seizure claims were unripe, because the County had not been given the opportunity to review and deny a permit application to develop the lots. ER-7. The district court did not deny that the LCP categorically prohibits development of Mr. Mendelson's land and paper streets leading thereto. Indeed, the district court outright declined to interpret the LCP and instead delegated that quintessentially judicial task to the County. ER-5 (concluding that what "matters" is "the County's interpretation of the LCP"); *but see Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."). Following entry of the district court's final order, Mr. Mendelson timely appealed. ER-9.

## V.     SUMMARY OF THE ARGUMENT

## A.     Mr. Mendelson's Takings and Seizure Claims Are Ripe

The district court held that Mr. Mendelson's takings claim was unripe, because the County has not been given an opportunity to make a final decision on a development proposal for the lots. ER 5. The district court relied on a judicially created, prudential doctrine that generally requires a landowner to "explore development opportunities" to ripen his takings claim "if there is uncertainty as to

the land's permitted use." *Palazzolo v. Rhode Island*, 533 U.S. 606, 622 (2001). However, the landowner need not submit a development proposal if the permitting agency has no discretion to approve development in the first place—i.e., if "there [is] no question … about how the regulation[] at issue [applies] to the particular land in question." *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 739 (1997).

At bottom, whether Mr. Mendelson's takings claim is ripe depends on whether the County has the ***discretion*** under the LCP to approve economically viable development with the Riparian Corridor and buffer zone. If it does, then the takings claim is unripe. If the County does not have such discretion, then submitting a development proposal for certain denial by the County would be futile and legally unnecessary, and the claim is ripe.

Here, there is no question that the County lacks the discretion to approve *any* development in the Riparian Corridor and buffer zone, rendering Mr. Mendelson's takings claim ripe. Mr. Mendelson's lots lie in the Riparian Corridor and buffer zone, and the paper streets leading to those lots cut right through the Riparian Corridor. ER-16 (map of lots' location); ER-13—14 (Complaint ¶¶ 11-13); ER-24—26 (LCP Policies 7.8 - 7.12). The plain terms of the LCP prohibit economically beneficial development there, without exception. *Id.* Significantly, the LCP gives the County no discretion to allow development in the Riparian Corridor and buffer zone, where the lots and paper streets are located. Because the County ***must*** deny any development proposal submitted by Mr. Mendelson, he need not submit one in order to ripen his takings claim. His takings claim is ripe.

16

Recognizing the LCP leaves absolutely no room for doubt that Mr. Mendelson's lots and paper streets are undevelopable, the County is forced to look *outside* its LCP to try and defeat Mr. Mendelson's claim. Specifically, the County claims that section 30010 of the Coastal Act somehow gives it the discretion to ignore the LCP, and allow development in the Riparian Corridor and buffer zone. Cal. Pub. Res. Code § 30010. But section 30010 states that permitting agencies applying the *Coastal Act* to a development proposal cannot construe *the Act* as authorizing the taking of property without compensation. *Id*. Thus, if application of the Coastal Act would bar all development of a property, the minimum amount of development necessary to avoid an uncompensated taking may be authorized. However, the County does not apply the Coastal Act to development proposals within its jurisdiction; it applies only its LCP, which does not incorporate, implicitly or otherwise, section 30010. Nor does the LCP contain any other provision conferring discretion to allow development on property in the Riparian Corridor and buffer zone. Because it does not apply here, section 30010 does not render Mr. Mendelson's takings claim unripe.

**B.    Mr. Mendelson States Facts Sufficient to Support a Seizure Claim**

The paper streets leading to Mr. Mendelson's lots run through the heart of the Riparian Corridor, thereby precluding their development. ER-16. That means that, as a matter of law, the County must deprive Mr. Mendelson of any meaningful possession (let alone economically beneficial or productive use) of his property. Those allegations easily support a claim for an unreasonable seizure of property under the Fourth Amendment, which protects against "meaningful

17

interference with an individual's possessory interests in [his] property." U.S. Const. amends. IV (seizure clause), XIV (Due Process Clause, incorporating protections as against local governments); *Soldal v. Cook Cty.*, 506 U.S. 56, 61, 68 (1992).

## C.    Mr. Mendelson's Seizure Claim Is Ripe

The seizure claim is not governed by the "ripeness" framework applicable to takings claims. *Severance v. Patterson*, 566 F.3d 490, 500 (5th Cir. 2009). Rather, it is governed by the "ripeness" framework set forth in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149-55 (1967), which weighs the following factors: (1) whether the issues are purely legal; (2) whether the issues are based on final agency action; (3) whether the controversy has a direct and immediate impact on the plaintiff; and (4) whether the litigation will expedite, rather than delay or impede, effective enforcement by the agency. *Id.*

Here, the issue presented by the seizure claim is purely legal. The County cannot dispute that the paper streets to Mr. Mendelson's lots run through the heart of the Riparian Corridor and are therefore undevelopable. The only question is whether that prohibition on development of those streets effects an unreasonable seizure by eliminating Mr. Mendelson's physical possession of his lots. Further, the resolution of the issue turns entirely on a "final agency action" or "rule" of "general . . . applicability"—namely, the LCP. *Abbott*, 387 U.S. at 149. This controversy also directly and immediately impacts Mr. Mendelson, who is ready, willing, and able to build, but is legally thwarted by a law that precludes physical access to his lots. Finally, the last factor does not apply, because this case does not

18

involve a pre-enforcement challenge to a law. On balance, the factors weigh in favor of a finding Mr. Mendelson's seizure claim ripe.

## VI.    STANDARD OF REVIEW

The Court reviews *de novo* the district court's dismissal of the takings and seizure claims for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), and for the Complaint's failure to state a seizure claim under Rule 12(b)(6). *Carson Harbor Vill., Ltd. v. City of Carson*, 353 F.3d 824, 826 (9th Cir. 2004); *City of Oakland v. Wells Fargo & Co.*, 972 F.3d 1112, 1121 (9th Cir. 2020). In both cases, the Court must accept all factual allegations in the complaint as true. *Carson Harbor*, 353 F.3d at 826; *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1029-30 (9th Cir. 2009).

In addition, the Court "review[s] *de novo* questions of statutory interpretation." *City of Oakland*, 972 F.3d at 1121.

## VII.    ARGUMENT

### A.    Mr. Mendelson's Takings Claim Is Ripe

#### 1.    The Claim Is Ripe, Because It Is Certain That No Development Can Be Approved on Mr. Mendelson's Lots Under the LCP

A takings claim is ripe for judicial review if the court knows "how far the [challenged] regulation goes" in allowing development on the plaintiff's land. *MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 348 (1986). A permit agency's final decision on a proposal for a piece of property, which the agency has discretion to approve or deny, is one way to show how far the regulation goes in

precluding economically viable use. *Williamson County Reg'l Planning Com. v. Hamilton Bank*, 473 U.S. 172, 186 (1985).[7] But it's not the only way. If it is "clear that the agency lacks the discretion to permit any development, or the permissible uses of the property are known to a reasonable degree of certainty, a takings claim is likely to have ripened." *Palazzolo*, 533 U.S. at 620. *see also Williamson County*, 473 U.S. at 186 (obtaining a final decision is necessary when the agency has "flexibility or discretion").

When "the agency has no discretion to exercise over [an owner's] right to use her land, no occasion exists for" requiring "a landowner take steps to obtain a final decision about the use that will be permitted on a particular parcel." *Suitum*, 520 U.S. at 739. The absence of discretion to approve development means "there [is] no question . . . about how the regulation[] at issue [applies] to the particular land in question." *Suitum*, 520 U.S. at 739 (internal citation and quotation marks omitted). As the Supreme Court has explained, a landowner "is required to explore development opportunities on his . . . parcel only if there is uncertainty as to the land's permitted use." *Palazzolo*, 533 U.S. at 622.

Here, the County has no discretion to approve development of the paper streets leading to Mr. Mendelson's lots or of the lots themselves. It *must* deny any development proposal he might submit.

Mr. Mendelson's four lots are located within the Riparian Corridor and

---

[7] *Overruled on other grounds in Knick v. Twp. of Scott*, 139 S. Ct. 2162 (2019).

buffer zone. ER-13—14 (Complaint ¶¶ 12-13). Three of the lots (nos. 5-7) lie entirely within the County's Riparian Corridor. ER-17 (Complaint ¶ 23). The fourth lot (no. 4) lies almost entirely within the Montecito Riparian Corridor, with a small portion located in the corridor's buffer zone. *Id.* The paper streets leading to all four lots—and providing the only access to them—cut through the heart of the Riparian Corridor. ER-16 (map). Given the lots' location, and the absence of physical access to those lots except through the undevelopable Riparian Corridor, Mr. Mendelson's lots are completely unbuildable under the LCP for *any* economically beneficial use, including for single-family homes as otherwise allowed in that zone. ER-17 (Complaint ¶ 24). As a consequence, there is no question about how the LCP applies to Mr. Mendelson's property.

Nor does the LCP provide the County with any discretion to deviate from the LCP's prohibition on all development of the paper streets and Mr. Mendelson's lots. The LCP contains no "savings" clause that would permit it to approve development in order to avoid a taking. ER-14 (Complaint ¶ 14). And it contains no variance or other mechanism by which to allow development contrary to the LCP. *Id.*

In sum, the plain terms of the LCP categorically and indisputably prohibit any development of Mr. Mendelson's lots. That fact, coupled with the fact that it is "clear that the [County] lacks the ***discretion*** to permit any development" contrary to the LCP, renders his takings claim ripe for judicial review. *Palazzolo*, 533 U.S. at 620 (emphasis added).

21

**2.    The Coastal Act Does Not Provide the County Any Discretion To Ignore Its Own LCP**

The County will argue that Mr. Mendelson's takings claim is unripe, because it has the discretion to approve development on his lots under section 30010 of the Coastal Act. Again, that section states:

> The Legislature hereby finds and declares that ***this division [i.e., the Coastal Act]*** is not intended, and shall not be construed as authorizing the commission, governing body, or local government ***acting pursuant to this division*** to exercise their power to grant or deny a permit in a manner which will take or damage private property for public use, without the payment of just compensation therefor.

Pub. Res. Code § 30010 (emphasis added).

The County's reliance on section 30010 is misplaced. By its own terms, section 30010 concerns a permitting authority's construction and application of the ***Coastal Act*** when granting or denying Coastal Development Permits. For example, in the absence of an LCP, a local government may issue Coastal Development Permits for projects within its jurisdiction if those projects are in "conformity with Chapter 3 [of the Coastal Act]." Pub. Res. Code § 30604(a). In those circumstances, the local government construes and acts pursuant to ***the Coastal Act***, and section 30010 dictates that it do so in a way that avoids an unconstitutional taking.

However, section 30010 does not control the construction and application of other laws, including LCPs. In this case, it does not apply to the County, because the County has an LCP that it must apply when reviewing development proposals. The County does not construe, apply, or otherwise act pursuant to the Coastal Act when it decides whether to approve or deny a Coastal Development Permit within

its jurisdiction. *See* Zoning Regulations § 6328.12 (stating that the County applies the LCP, not the Coastal Act, to Coastal Development Permit applications); *see also* Zoning Regulations § 6328.3(e) (defining a "Coastal Development Permit" as "a letter or certificate . . . approving a project . . . as being in conformance with the Local Coastal Program," not the Coastal Act); Cal. Pub. Res. Code § 30519 (providing that certification of an LCP ends the Commission's "development review authority," which is thereafter delegated "to the local government that is implementing the local coastal program," not the Coastal Act); *id.* § 30600.5 (following certification of a land use plan, the local government must issue a Coastal Development Permit if the project "is in conformity with the certified land use plan," not the Coastal Act); *cf. Security Nat'l*, 159 Cal. App. 4th at 422 (holding that where there is a certified LCP, the question is whether "the development . . . conform[s] to the standards set forth in the certified LCP," not the Coastal Act).

The fact that the County has no discretion to grant variances or other exemptions from the LCP's prohibition on development in the Riparian Corridor is consistent with the County's own historic understanding of the law. County staff have long taken the position that only a legislative amendment to the LCP, incorporating a provision specifically authorizing the County to grant variances, could confer the kind of discretion necessary to allow development in the Riparian Corridor. *See* Appellant's Motion for Judicial Notice, Exhs. A-B. As one planner explained in an internal memorandum to fellow staff, "there is no legal basis" for granting an administrative variance or exemption following submission of a

23

development proposal. *Id.*, Exh. A. And, as another planner made clear to property owners seeking to build on their lot in the Riparian Corridor, "[i]n order for us to approve a building permit for a house within the Riparian Corridor, the zoning and Local Coastal Program must be amended." *Id.*, Exh. B (at p. 1). If, as the County now claims, section 30010 applied to project proposals in the Riparian Corridor, so that it could freely dispense variances and approve Coastal Development Permits, then there would be no need for the County to pursue a costly and time-consuming legislative amendment to the LCP to incorporate a variance process. Cal. Pub. Res. Code § 30514 (describing process for amending LCPs). The County's litigation position is at odds with its historic—and correct—understanding of the LCP.

In sum, the County's sole basis for claiming discretion—section 30010 of the Coastal Act—is inapplicable, because the County implements its own LCP, not the Coastal Act. As for the LCP, it contains no "savings" clause, variance mechanism, or like provision authorizing the County to deviate from faithful application of the law. Consequently, the County has no discretion to grant a Coastal Development Permit for development of Mr. Mendelson's lots, making his takings claim ripe.[8]

---

[8] If the County believes section 30010 gives it the discretion to deviate from its LCP, why did the County not respond to Mr. Mendelson's application for a "takings analysis" by informing him of the potential to build on the lots subject to review of a development application? The County's silence speaks volumes, and reflects the reality that the County has no discretion to approve any development on Mr. Mendelson's lots.

**3.    Submitting a Development Proposal to the County Would Be an Exercise in Futility, Which No Court Precedent Demands**

Given that the LCP confers no discretion on the County to depart from its development ban on Mr. Mendelson's lots, submitting a specific proposal for development would be an exercise in futility. As the Supreme Court held, the ripeness doctrine "does not require a landowner to submit applications for their own sake." *Palazzolo*, 533 U.S. at 622. A landowner "is required to explore development opportunities on his . . . parcel ***only if*** there is uncertainty as to the land's permitted use." *Id.* (emphasis added). The reason is simple: "The law does not require futile acts." *Vigil v. Tansy*, 917 F.2d 1277, 1279 (10th Cir. 1990).

The County itself acknowledges the futility of submitting plans to develop in the Riparian Corridor. It created a process whereby a property owner can request a determination whether the LCP bars development on his land in a way that effects a compensable taking. ER-15 (Complaint ¶ 18). The application for such a determination—called a "takings analysis"—does not require the submission of a specific development proposal.[9] *Id.* ¶ 18.

In June 2018, Mr. Mendelson applied for a County determination confirming the obvious: the LCP categorically bars development of his lots, resulting in an as-applied taking of his property. ER-18 (Complaint ¶ 29). Almost three years later,

_____

[9] It is immaterial that Mr. Mendelson did not submit to the County, as part of this special application process, specific information about (1) the lots' physical characteristics (a matter of public record in the County's possession); or (2) the lots' purchase history and appraised value (which are legally irrelevant to whether development is allowed on the lots).

the County still has refused to respond. ER-18 (Complaint ¶ 30). If not already ripe as described above, his takings claim certainly ripened in light of the County's non-response, which reflects the County's tacit agreement that Mr. Mendelson cannot make any economically beneficial use of his property, and that the County has no intention of paying him just compensation. *Hoehne v. County of San Benito*, 870 F.2d 529, 535 (9th Cir. 1989) (finding that, although a county did not have the opportunity to review a permit or rezoning application, its board of supervisors "sent a clear and . . . final signal announcing their views as to the acceptable use of the property" that was sufficient to ripen a takings claim).

The County had ample opportunity to contact Mr. Mendelson with respect to his application, or to request whatever additional information or documentation it deemed necessary. The County chose to remain silent and ignore Mr. Mendelson's repeated attempts to avail himself of the special application process set up by the County. ER-18 (Complaint ¶ 30). The County's silence sent a clear signal to Mr. Mendelson that the County knew there was a taking of Mr. Mendelson's lots, thereby ripening his claim. *Id.*

Mr. Mendelson's takings claim is ripe, because the County has no discretion to allow development on his lots under the LCP. In light of that undisputable fact, the Court should reject the County's call to force Mr. Mendelson to "explore" non-existent development opportunities through the submission of pointless development applications. That would be a futile act, which the "ripeness" doctrine does not demand.

**4.    Requiring Mr. Mendelson To Submit a Development Proposal That the County Must Deny Would Impose an Undue Burden on Him**

As explained above, it would be utterly futile to require Mr. Mendelson to submit a permit application for the development of his lots, when it is clear—beyond any doubt—that the lots and the paper streets leading to them are unbuildable under the LCP. *Palazzolo*, 533 U.S. at 622 (holding that the ripeness doctrine "does not require a landowner to submit applications for their own sake," and that a landowner "is required to explore development opportunities on his . . . parcel only if there is uncertainty as to the land's permitted use"). That futility is only underscored by the County's refusal to respond to Mr. Mendelson's application for a "takings analysis"—an application process that the County itself instituted. ER-18 (Complaint ¶¶ 29-30).

Further, even if applying for a permit to build on unbuildable lots made sense, the County has established a cost-prohibitive, time-consuming, two-tiered permit system evidently designed to ***avoid*** a final decision on a development proposal.

First, Mr. Mendelson would need a Coastal Development Permit to perform preliminary survey work on the paper streets and lots *before* submitting a formal development plan. ER-17 (Complaint ¶ 26). Applying for that first Coastal Development Permit would require Mr. Mendelson to hire a biologist to complete a survey and map of the streets and lots, because cutting a pathway up the streets to the lots for surveying and mapping would remove vegetation and disturb the land. *Id.* A County-approved Coastal Development Permit would be needed to clear

impassable protected vegetation through to and inside the lots—all for the sole purpose of establishing what is already known and undisputed: The lots and all street access to them are covered in legally protected, riparian vegetation and are inside the Montecito Riparian Corridor. *Id.* Under the plain terms of the LCP, the first Coastal Development Permit would have to be denied.

Second, in the purely hypothetical event the first Coastal Development Permit were approved, Mr. Mendelson would then need a *second* Coastal Development Permit to develop the paper streets and build houses on the lots. ER-17 (Complaint ¶ 27). For the reasons stated above, the second Coastal Development Permit would be denied outright under the LCP. But the point is that Mr. Mendelson would not get as far as applying for and obtaining a "final decision" on the **second** Coastal Development Permit, because the **first** Coastal Development Permit for preliminary work would be denied; without a survey, the County would not entertain the second Coastal Development Permit for actual development of the paper streets and lots. Denial of the first Coastal Development Permit would eliminate any reason for pursuing the second Coastal Development Permit. ER-17 (Complaint ¶ 26).

In other words, the County has structured its two-tiered permit process for development in the Riparian Corridor so that it never even has to review a development plan and formally make a "final decision" about whether and the extent to which the LCP allows development on Mr. Mendelson's lots. ER-17 (Complaint ¶ 26). As the Supreme Court's decision in *Suitum* teaches, "[g]overnment authorities . . . may not burden property by imposition of repetitive

28

or unfair land-use procedures in order to avoid a final decision." *Suitum*, 533 U.S. at 621.

Even in the best-case scenario, the culmination of this cost-prohibitive, time-wasting, two-tiered permit process would reveal nothing more than what the parties and the Court already know: No development of the paper streets leading to Mr. Mendelson's lots, or of the lots themselves, is allowed under the LCP. It is "unfair"—in addition to futile—to force Mr. Mendelson through such unreasonable, duplicative, and costly procedures. *Suitum*, 533 U.S. at 621; *cf. Palazzolo*, 533 U.S. at 620-21 (holding that, where a land-use authority has the requisite flexibility and discretion to grant or deny a land-use permit, it must be given "the opportunity, using its own reasonable procedures, to decide and explain the reach of a challenged regulation"); *MacDonald*, 477 U.S. at 350 n.7 (stating that "[a] property owner is of course not required to resort to piecemeal litigation or otherwise unfair procedures in order to obtain this determination" of whether and the extent to which challenged regulation allows development).

### 5. Courts Have the Discretion To Assume Ripeness and Proceed to the Merits of the Takings Claim

The "final decision" doctrine is "prudential, not jurisdictional." *Pakdel v. City & Cty. of San Francisco*, 952 F.3d 1157, 1169 (9th Cir. 2020); *see also Suitum*, 520 U.S. at 733-34 (referring to the "final decision" requirement as a "prudential hurdle"). As such, courts "have the discretion to waive the [final decision] requirement[] . . ., assume that ripeness is met and continue with [their] analysis" of a takings claim. *Adam Bros. Farming, Inc. v. County of Santa*

*Barbara*, 604 F.3d 1142, 1148 (9th Cir. 2010). Prudential ripeness "has a 'twofold aspect, requiring [courts] to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Golden v. Cal. Emergency Physicians Med. Group*, 782 F.3d 1083, 1086 (9th Cir. 2015) (quoting *Abbott*, 387 U.S. at149).

The Court should exercise its discretion to waive the "final decision" requirement, assume that Mr. Mendelson's takings claim is ripe, and proceed to the merits of that claim. As explained above, everyone knows how the LCP applies to Mr. Mendelson's lots—it categorically prohibits development there—and to require Mr. Mendelson to submit development proposals for the County's review would be utterly futile and a waste of resources for all parties concerned. Further, the equities weigh strongly in favor of finding the takings claim ripe. Requiring Mr. Mendelson to go through a pointless, two-tiered application process that would end in certain denial would impose an extraordinary financial hardship on him. ER-14—15 (Complaint ¶¶ 15-17).

## B.    Mr. Mendelson States Facts Sufficient to Support His Seizure Claim

In its motion to dismiss, the County argued that Mr. Mendelson does not state facts sufficient to support a seizure claim. (Docket No. 11, p. 13; ER-7). The County errs.

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; *see id.*, *amend.* XIV. "The Fourth Amendment's protections against unreasonable seizures clearly extend to real property." *Presley*

*v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). A seizure of property occurs "when there is some meaningful interference with an individual's possessory interests in that property" and may be found "even though no search . . . has taken place." *Soldal*, 506 U.S. at 61, 68; *Presley*, 464 F.3d at 487 (same).[10] Whether a seizure is "reasonable" depends "on all of the circumstances surrounding the . . . seizure and the nature of the . . . seizure itself." *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 619 (1989). This test requires "balancing [the] intrusion on the individual's Fourth Amendment interests against [the] promotion of legitimate governmental interests." *Id.*

Here, Mr. Mendelson's four lots are located completely within the Montecito Riparian Corridor and buffer zone. ER-16—17 (Complaint ¶ 22-23). So too are the paper streets that must be constructed to allow physical access to his lots. *Id.* Under the LCP, the County cannot permit the construction of paper streets through the heart of the Montecito Riparian Corridor. Therefore, as a matter of law, Mr. Mendelson has no physical access to his property. While he may hold title to and pay taxes on the four lots, he has no ***meaningful*** possession of them and has been deprived of their use by the presence of LCP protected vegetation. *See Presley*, 464 F.3d at 487 (holding that deprivation of use may rise to the level of a

---

[10] The same facts that support a Fourth Amendment seizure of Mr. Mendelson's lots also support a Fifth Amendment taking. "[T]he Supreme Court has time and again considered multiple constitutional claims based on the same facts." *Presley*, 464 F.3d at 484 (rejecting district court's dismissal of seizure claim on basis that it was the same as the plaintiff's takings claim).

meaningful interference with possessory interests). Thus, the Complaint alleges facts sufficient to establish "a meaningful interference with [Mr. Mendelson's] possessory interests in [his] property." *Soldal*, 506 U.S. at 68.

Further, the Complaint states facts sufficient to establish the unreasonableness of the seizure. Though Mr. Mendelson is ready, willing and able to construct homes on his four lots ER-18 (Complaint ¶ 31), he is barred, as a matter of law, from using *any* part of his property for an economically beneficial or viable purpose. This total and unconditional interference with his right to possess and use his property, in any practical or legal way, is patently unreasonable. *Presley*, 464 F.3d at 487 (finding a seizure where owner was "deprived of the use of part of her property" due to trespassers encouraged and abetted by the city).

The County may argue that Mr. Mendelson fails to state a claim for seizure, because he has alleged no facts that the County has taken physical possession of the property, physically prohibited his possession or entry, or physically interfered with his right to exclude others. That misreads the caselaw. The standard for establishing a seizure in this context is whether County law has meaningfully interfered with Mr. Mendelson's possessory interest in his lots, and it has. The standard is **not** whether the County has taken physical possession or physically interfered with the right to exclude.[11] *Presley*, 464 F.3d at 487 (finding seizure,

---

[11] On the other hand, the right to exclude presupposes full possession of the property. How can an owner exercise the right to exclude, when the government completely bars his physical access to the property?

where government did not take possession of the property); *Pepper v. Village of Oak Park*, 430 F.3d 805, 809 (7th Cir. 2005) (noting that "substantial damage to [a] couch" was a seizure, even though it did not affect the right to exclude); *United States v. Gray*, 484 F.2d 352, 356 (6th Cir. 1973) (holding that temporarily removing rifles from a closet to copy down their serial numbers was a seizure, even though it did not affect the right to exclude). The County has prohibited Mr. Mendelson's possession of or entry to the lots, because the LCP flatly prohibits his disturbance or use of the paper streets that represent the only physical access to his property. ER-16 (Complaint ¶¶ 20, 22).

## C.  Mr. Mendelson's Seizure Claim Is Ripe

The district court concluded the seizure claim was unripe, on the same ground as it found the takings claim unripe. ER-7. Review of the seizure claim for ripeness is governed by the "ripeness" framework set forth in *Abbott*, 387 U.S. at 149-55, which weighs the following factors: (1) whether the issues are purely legal; (2) whether the issues are based on final agency action; (3) whether the controversy has a direct and immediate impact on the plaintiff; and (4) whether the litigation will expedite, rather than delay or impede, effective enforcement by the agency. *Id.*

Here, the seizure claim raises a purely legal question: Does the LCP's prohibition on development of paper streets leading to Mr. Mendelson's lots result in a meaningful interference with possession of those lots that raises to the level of an unreasonable seizure? That the streets are impassable and covered in protected

vegetation, and lie entirely in the Riparian Corridor cannot be—and is not—disputed by the County. ER-16, ER-38 (maps of lots' location in corridor).

Next, the claim is based on a "final agency action." which has been interpreted to include "rule[s] . . . of general or particular applicability and future effect, designed to implement, interpret, or prescribe law or policy." *Abbott*, 387 U.S. at 149. The LCP is a set of such rules of general and particular applicability, as it is the exclusive law governing development in the County's coastal zone.

Moreover, the controversy giving rise to the seizure claim has a direct and immediate impact on Mr. Mendelson. Simply put, he is ready, willing, and able to build homes on his four lots, but he cannot even physically access those lots. ER-18; ER-16, ER-38 (maps of lots' location in corridor). The reason is that the LCP precludes development of the very paper streets that would provide him with such access. The impact is direct and immediate. Finally, this is not an "enforcement" action, so the fourth factor does not apply.

In light of the *Abbott* factors, the seizure claim should be deemed ripe.

## VIII.   CONCLUSION

Mr. Mendelson's takings and seizure claims are ripe for review. Further, he states facts sufficient to support a seizure claim. The Court should reverse the district court's order dismissing Mr. Mendelson's case and instruct it to deny the County's motion in its entirety.

Date: March 10, 2021                    Respectfully submitted,


                                        *s/* Paul J. Beard II
                                        PAUL J. BEARD II

                                        *Attorney for Appellant*
                                        FELIX MENDELSON, as trustee for
                                        THE SHTAIMAN FAMILY TRUST

35

## CERTIFICATE OF COMPLIANCE

I am the attorney of record in this case.

**This brief contains 9146 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature:** s/ Paul J. Beard II                  **Date:** March 10, 2021
                PAUL J. BEARD II

**ADDENDUM**

| Description | Page |
|---|---|
| U.S. Constitution, amend. IV | 38 |
| U.S. Constitution, amend. V | 38 |
| U.S. Constitution, amend. XIV | 38 |
| Cal. Pub. Res. Code § 30010 | 39 |
| San Mateo County LCP Policy 7.1 | 39-40 |
| San Mateo County LCP Policy 7.8 | 40 |
| San Mateo County LCP Policy 7.9 | 40-41 |
| San Mateo County LCP Policy 7.10 | 41 |
| San Mateo County LCP Policy 7.11 | 41-42 |
| San Mateo County LCP Policy 7.12 | 42 |
| San Mateo County Zoning Regulation § 6328.3(e) | 42 |
| San Mateo County Zoning Regulation § 6328.12 | 43 |
| San Mateo County Zoning Regulation § 6328.13 | 43 |

## U.S. Constitution

**Fourth Amendment**

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

**Fifth Amendment**

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

**Fourteenth Amendment, Section 1**

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

## California Public Resources Code

**Section 30010. Compensation for taking of private property; legislative declaration**

The Legislature hereby finds and declares that this division is not intended, and shall not be construed as authorizing the commission, port governing body, or local government acting pursuant to this division to exercise their power to grant or deny a permit in a manner which will take or damage private property for public use, without the payment of just compensation therefor. This section is not intended to increase or decrease the rights of any owner of property under the Constitution of the State of California or the United States.

### San Mateo County's Local Coastal Program Policies

**Policy 7.1. Definition of Sensitive Habitats**

Define sensitive habitats as any area in which plant or animal life or their habitats are either rare or especially valuable and any area which meets one of the following criteria: (1) habitats containing or supporting "rare and endangered" species as defined by the State Fish and Game Commission, (2) all perennial and intermittent streams and their tributaries, (3) coastal tide lands and marshes, (4) coastal and offshore areas containing breeding or nesting sites and coastal areas used by migratory and resident water-associated birds for resting areas and feeding, (5) areas used for scientific study and research concerning fish and wildlife, (6) lakes and ponds and adjacent shore habitat, (7) existing game and wildlife refuges and reserves, and (8) sand dunes. Sensitive habitat areas include,

39

but are not limited to, riparian corridors, wetlands, marine habitats, sand dunes, sea cliffs, and habitats supporting rare, endangered, and unique species.

**Policy 7.8. Designation of Riparian Corridors**

Establish riparian corridors for all perennial and intermittent streams and lakes and other bodies of freshwater in the Coastal Zone. Designate those corridors shown on the Sensitive Habitats Map and any other riparian area meeting the definition of Policy 7.7 as sensitive habitats requiring protection, except for manmade irrigation ponds over 2,500 sq. ft. surface area.

**Policy 7.9. Permitted Uses in Riparian Corridors**

a. Within corridors, permit only the following uses: (1) education and research, (2) consumptive uses as provided for in the Fish and Game Code and Title 14 of the California Administrative Code, (3) fish and wildlife management activities, (4) trails and scenic overlooks on public land(s), and (5) necessary water supply projects.

b. When no feasible or practicable alternative exists, permit the following uses: (1) stream dependent aquaculture, provided that non-stream dependent facilities locate outside of corridor, (2) flood control projects, including selective removal of riparian vegetation, where no other method for protecting existing structures in the floodplain is feasible and where such protection is necessary for public safety or to protect existing development, (3) bridges when supports are not in significant conflict with corridor resources, (4) pipelines, (5) repair or maintenance of roadways or road crossings, (6) logging operations which are limited to temporary skid trails, stream crossings, roads and landings in accordance

40

with State and County timber harvesting regulations, and (7) agricultural uses, provided no existing riparian vegetation is removed, and no soil is allowed to enter stream channels.

**Policy 7.10. Performance Standards in Riparian Corridors**

Require development permitted in corridors to: (1) minimize removal of vegetation, (2) minimize land exposure during construction and use temporary vegetation or mulching to protect critical areas, (3) minimize erosion, sedimentation, and runoff by appropriately grading and replanting modified areas, (4) use only adapted native or non-invasive exotic plant species when replanting, (5) provide sufficient passage for native and anadromous fish as specified by the State Department of Fish and Game, (6) minimize adverse effects of waste water discharges and entrainment, (7) prevent depletion of groundwater supplies and substantial interference with surface and subsurface waterflows, (8) encourage waste water reclamation, (9) maintain natural vegetation buffer areas that protect riparian habitats, and (10) minimize alteration of natural streams.

**Policy 7.11. Establishment of Buffer Zones**

a. On both sides of riparian corridors, from the "limit of riparian vegetation" extend buffer zones 50 feet outward for perennial streams and 30 feet outward for intermittent streams.

b. Where no riparian vegetation exists along both sides of riparian corridors, extend buffer zones 50 feet from the predictable high water point for perennial streams and 30 feet from the midpoint of intermittent streams.

c. Along lakes, ponds, and other wet areas, extend buffer zones 100 feet from the high water point except for man-made ponds and reservoirs used for agricultural purposes for which no buffer zone is designated.

**Policy 7.12. Permitted Uses in Buffer Zones**

Within buffer zones, permit only the following uses: (1) uses permitted in riparian corridors; (2) residential uses on existing legal building sites, set back 20 feet from the limit of riparian vegetation, only if no feasible alternative exists, and only if no other building site on the parcel exists; (3) on parcels designated on the LCP Land Use Plan Map: Agriculture, Open Space, or Timber Production, residential structures or impervious surfaces only if no feasible alternative exists; (4) crop growing and grazing consistent with Policy 7.9; (5) timbering in "streamside corridors" as defined and controlled by State and County regulations for timber harvesting; and (6) no new residential parcels shall be created whose only building site is in the buffer area.

**San Mateo County's Zoning Regulations**

**Section 6328.3(E)**

"Coastal Development Permit" means a letter or certificate issued by the County of San Mateo in accordance with the provisions of this Chapter, approving a project in the "CD" District as being in conformance with the Local Coastal Program. A Coastal Development Permit includes all applicable materials, plans and conditions on which the approval is based.

**Section 6328.12. Standards for Application Review.**

The officer, commission or board acting on a Coastal Development Permit shall review the project for compliance with: all applicable plans, policies, requirements and standards of the Local Coastal Program, as stated in Sections 6328.19 through 6328.30 of this Chapter; the County General Plan; requirements of the underlying district; and other provisions of this Part. To assist this review, the Planning Director shall, as part of the recommendation required by Section 6328.8, complete a Coastal Policy Checklist, as defined in Section 6328.3.

**Section 6328.13. Precedence of Local Coastal Program.**

Where the plans, policies, requirements or standards of the Local Coastal Program, as applied to any project in the "CD" District, conflict with those of the underlying district, or other provisions of this Part, the plans, policies, requirements or standards of the Local Coastal Program shall take precedence.